IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA

Abingdon Division

IN THE MATTER OF THE ARRESTS OF:      UNDER SEAL
J.B BUCKNER     Case No._____

## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT AND ARREST WARRANTS

1. Your affiant, William C. Duke, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Washington Field Division, Bristol Post of Duty, having been duly sworn, deposes and states as follows:

### Introduction

2. I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 United States Code, and am empowered by law to conduct investigations and to make arrests for the offenses enumerated in Section 2516 of Title 18 United States Code.

3. I have been employed as a Special Agent with the ATF since February 2005. I am currently assigned to the Bristol Virginia Field Office. Prior to becoming an ATF Special Agent, I was a Police Officer and Detective with the Chesterfield County Virginia Police Department for five and one half (5 ½) years. During my tenure in law enforcement, I have attended numerous schools and training hosted by ATF, HIDTA, state and local law enforcement and the Department of Justice, dealing in various techniques of investigating firearms, narcotics and criminal activity. I have taken part in numerous federal, state, and local investigations concerning violations of firearm and narcotic laws.

4. Through instruction and participation in investigations, your affiant has become familiar with the manner and methods by which narcotics traffickers conduct their illegal business and the language and terms that are used to disguise conversations about their narcotics activities. From experience and training, your affiant has learned, among other things, that in conversations narcotics traffickers believe susceptible to interception, they virtually never expressly refer to methamphetamine or other illegal drugs by name; instead to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms. Further, based upon your affiant's knowledge, training, experience and participation in firearm and narcotic trafficking investigations, your affiant knows that: Individuals who

1

deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders, electronic files/data, computers and papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These books, records, receipts, notes, ledgers, bank records, money orders, electronic files, computers, etc., are maintained in locations to which the dealers in illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

5. Individuals who deal in illegal controlled substances routinely conceal large quantities of currency, financial instruments, precious metals, jewelry, and other items of value, typically proceeds of illegal controlled substance transactions. Indeed, when drug traffickers amass large proceeds from the sale of drugs, they often attempt to legitimize or "launder" these profits. To accomplish this, drug traffickers may utilize domestic and foreign banks and/or financial institutions and their attendant services, such as securities, cashier's checks, money drafts, letters of credit and safe deposit boxes. All of these items are generally found within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

6. It is common for individuals who deal in the sale of illegal controlled substances, to secrete contraband related to the trafficking activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, hair dryers, blenders, pots, dishes and other containers for preparing methamphetamine and other controlled substances for distribution, within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

7. Individuals who deal in the sale and distribution of controlled substances commonly maintain telephone numbers and address books or papers which reflect names, addresses and/or telephone numbers for their associates. These individuals often utilize cellular telephones, and other means of electronic communication to maintain contact with their associates in their illegal businesses. These electronic devices, telephone records, bills and paper are often found within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

8. Individuals who deal in illegal controlled substances often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they

2

conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

9. Persons who traffic in controlled substances maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

10. Individuals involved in narcotics trafficking often own, possess and/or use firearms as a means of facilitating their illegal drug activities. Said firearms are used to protect and secure a drug traffickers property and narcotics from law enforcement and from theft by other criminals. Drug traffickers also possess firearms as a means of enforcing drug transactions, i.e., as a means of ensuring payment for the drugs they are selling. Such weapons are most often secreted within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas. Persons who possess or collect firearms also keep other firearm related equipment, to include ammunition, ammunition magazines, holsters, bullet proof vests, pistol grips, pistol boxes, cleaning kits and paperwork relating to the acquisition and disposition of firearms.

11. Individuals who are members of active drug organizations stay in regular contact with one another. This contact does not terminate once an individual is incarcerated. Incarcerated members of drug organizations routinely send letters to and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, from financial help to help in engaging in witness intimidation or elimination. In addition, incarcerated members often keep photographs of themselves and other members of their organization in order to obtain respect from other inmates.

12. The information contained in this affidavit is based on my personal observations, observations of other law enforcement officers, observations of Confidential Informants (CI's) and Cooperating Sources (CS) as related to me, my review of official police and government reports, and consultation with other agents/officer involved in the investigation and is provided for the limited purpose of establishing probable cause. The information is not a complete statement of all the facts related to this case.

INITIAL SUMMARY

13. Beginning in September 2012, law enforcement in Southwest Virginia began to obtain information regarding the manufacturing and distribution of quantities of crystal methamphetamine in the communities of Abingdon located in Washington County,

3

Virginia, Lebanon, VA, Mountain City, TN and Eastern Kentucky. Through arrests, search warrants, interviews, and the cultivation of confidential informants, law enforcement was able to identify a network of individuals involved in the possession and distribution of crystal methamphetamine, firearms trafficking and violent crime in Southwest Virginia, Eastern Kentucky, North East Tennessee, Arizona, California and Texas.

14. From September 2012 until the present, federal, state, and local law enforcement have conducted interviews, executed search warrants, conducted surveillance, analyzed phone records and conducted controlled purchases of methamphetamine and firearms from members of the conspiracy. In April 2014, approximately 30 defendants were arrested relating to this investigation. In December 2014 approximately 24 defendants were arrested. From the arrests, guilty pleas, search warrants and interviews associated with these events physical evidence and testimony was gained that show the ongoing and furtherance of a large scale conspiracy to distribute methamphetamines, use of firearms in furtherance of narcotics trafficking and laundering of the proceeds of narcotics trafficking.

15. This investigation has identified several drug trafficking organizations (DTO) operating in SW VA, NE TN and Eastern KY. Though the DTO operate independently, members of the DTO associate and do business with one another. The DTO identified in this indictment is the MUNCY-BOWMAN DTO. This DTO is operating in the Western District of Virginia, Eastern District of Kentucky and the Southern District of Texas.

## COUNT I

16. Commencing on or about March 2010 and continuing to date, the exact dates being unknown, in the Western District of Virginia and elsewhere, the defendants:

| **NAME** | **SSN last4** | **DOB-year** | **FBI#** |
|---|---|---|---|
| Buckner, JB | 2516 | 1959 | 123789V5 |

Conspired to violate of Title 21, United States Code, Section 846, Conspiracy to possess with the intent to distribute methamphetamine. This affidavit is submitted in support of a request that arrest warrants be issued for the above listed individuals for violation of Title 21, United States Code, Section 846.

17. Throughout the course of this investigation, numerous subpoenas and court orders were issued for electronic surveillance, telephone subscriber information, telephone toll records, cellular telephone content and text message content on cellular telephones. Text

4

messages were obtained via court order on the cell phones of Michael BOWMAN, Phillip MUNCY, James MUNCY, Nick BURKS and others. Any cellular telephone subscriber information and all text messages referred to within this affidavit, unless otherwise stated, are a result of these subpoenas and court orders.

18. Members of the BOWMAN and MUNCY drug trafficking organizations (DTO), with sources of supply in Texas, during the course of the conspiracy, have moved pounds of methamphetamine from TX to the Western District of Virginia. This was done at times in person with hand to hand transactions and the methamphetamine being trafficked back to the Western District of Virginia and/or the Eastern District of Kentucky. Money from the proceeds of the sale of methamphetamine was transferred in whole or part from the Western District of Virginia to accounts in Texas. From this point the meth was distributed for consumption by members of the DTO using hand to hand transactions or drops. Members of this organization have distributed firearms or carried firearms during the course of this conspiracy in furtherance of narcotics trafficking or during transactions involving the distribution of methamphetamine.

## STATEMENT OF PROBABLE CAUSE

### BUCKNER, J.B.

19. November 1, 2012 Danny Ray Martin was arrested in Pulaski County, VA after receiving a package that contained approximately three pounds of marijuana. Martin stated that he agreed to receive this package for a friend who was to pay him $300. On October 17, 2013 Martin was interviewed by VSP/DTF agents when indicted. Martin stated that the Marijuana belonged to JB BUCKNER and that he agreed to receive the package for payment of $300. Martin subsequently pled guilty to the charge.

20. January 30, 2013, CS-9 was interviewed in Bristol, VA. CS-9 stated that in the summer of 2012, CS-3 and Tim FIELDS took her to the area of Claytor Lake to obtain marijuana from a white male named "J.P." CS-9 stated that CS-3 and FIELDS filled the spare tire area of CS-3's gold Jeep Cherokee with bricks of marijuana supplied by "J.P." CS-9 provided detailed directions to the residence of "J.P." CS-9 stated "J.P." grew the marijuana at his house. CS-9 advised when they returned home CS-3 and FIELDS gave her some of the marijuana.

21. February 04, 2013, CS-9 positively identified a photograph of J.B. BUCKNER as the individual to whom she was referring as "J.P." CS-9 stated that BUCKNER is the guy that CS-3 and FIELDS have been supplied by several times.

22. February 05, 2013 surveillance was conducted on the residence of JB BUCKNER located at 3720 Lone Oak Rd., Radford Virginia. BUCKNER was observed exiting his Pewter colored Chevy Pick-up, VA Tag: YGA-7311. JB was observed entering his residence.

23. On April 03, 2013, CS-17 was interviewed in Bristol VA. CS-17 stated that in the summer or fall of 2012, he and CS-3 made a trip to the Radford/Claytor lake area to pick

5

up some money owed to CS-3 from a guy who sold marijuana. CS-17 provided a detailed description of the person, and subsequently identified a photograph of JB BUCKNER as the marijuana distributor. CS-17 stated that BUCKNER told them that his runners had just been arrested and he was "short" $1000 of what he owed to CS-3. CS-17 stated that CS-3 and BUCKNER smoked weed together before they departed.

24. October 28, 2013 Records received from UPS show that on this date package tracking #: 1ZRY22350340254880 was shipped from Myrtle Creek Oregon and delivered on November 4, 2013 to W.G. Gray, 3840 Glade Rd, Blacksburg, VA.

25. November 5, 2013 CS-1 contacted the Washington Co SO by telephone and reported that UPS package tracking number 1ZRY22350340254880 was a package of Marijuana from Portland Oregon that was delivered to an individual at 3720 Lone Oak Road, Radford, VA. CS-1 stated that the recipient of the drugs was using the numbers of (540) 230-4353 and (540) 731-4305. The CS then described BOWMAN's White SUV, Red VW Jetta (VA Lic. MWBVW) and two Harley Davidson Motorcycles. The CS stated that two Washington county men were in route from Washington County VA to the Lone Oak address on this date to pick up a large shipment of drugs.

26. On November 19, 2013, CS-1 was interviewed in Coeburn, VA. CS-1 stated that Michael BOWMAN and James MUNCY worked together in the distribution of methamphetamine and marijuana. CS-1 stated that BOWMAN's supplier of marijuana was J.B. BUCKNER in Pulaski, VA. CS-1 stated that BOWMAN purchased pounds of marijuana from BUCKNER for $4,000.00 per pound. CS-1 stated that the marijuana was usually packed in coffee cans and that BUCKNER paid $3,200.00 per pound. CS-1 stated that BOWMAN and MUNCY traveled to Pulaski, VA to obtain marijuana from BUCKNER about once a week for the past year. CS-1 stated that BOWMAN does not travel in the direction of exit 94 in Pulaski for any other reason than drug exchange. CS-1 stated that BOWMAN will have crystal meth on him while traveling north on I-81. CS-1 stated that BUCKNER purchases crystal meth form BOWMAN. CS-1 stated that BUCKNER's cellular telephone numbers were (540) 230-4353 and (540) 731-4305. CS-1 in the letters received by law enforcement and in this interview provided detailed information on the BOWMAN DTO and numerous involved co-conspirators previously mentioned in this indictment.

27. On November 25, 2013, a search warrant was issued in the Western District of Virginia authorizing a search of the cellular telephone utilizing telephone number (276) 591-7057 (BOWMAN's old cell phone), which had previously been obtained by law enforcement. Contained within the Contacts List of this phone were the following names and numbers:

    - "JB" (540) 230-4353 As a result of this investigation, this telephone number was known to law enforcement as being utilized by J.B. BUCKNER, a co-conspirator in this drug trafficking organization.

28. Pursuant to this search warrant, the electronic data was extracted from this phone and analyzed. As a result of this analysis, the following conversations were noted:

6

**April 15, 2013**

(540) 250-4820 (James MUNCY) to BOWMAN, *"I have been stuck on 81 for 2.5 hours wreck upahead two trucks"*

BOWMAN to MUNCY, *"Can you go back and meet JB for me if he will? Can you crods median and turn arou nd?"*

MUNCY to BOWMAN, *"Been here 55 min took me 1hr from draper"*

BOWMAN to MUNCY, *"Will you go back to that wide spot at exit 94 and meet JB for me?"*

MUNCY to BOWMAN, *"What time"*

BOWMAN to MUNCY, *"Can you be back there in 30 minutes"*

MUNCY to BOWMAN, *"Turnig around"*

BOWMAN to MUNCY, *"Ok let me call JB"*

BOWMAN to MUNCY, *"He will be there in about 30 minutes. Thanks James. Things no better with Kim?"*

MUNCY to BOWMAN, *"Ye ok no fighting"*

MUNCY to BOWMAN, *"Ok im here"*

BOWMAN to MUNCY, *"Ok let me check on him"*

BOWMAN to MUNCY, *"He should be there any minute now."*

MUNCY to BOWMAN, *"Ok got it"*

BOWMAN to MUNCY, *"Ok buddy be careful. Has the traffic got any better?"*

29. Based on my training and experience, and my knowledge of this investigation, I believe that James MUNCY notified Michael BOWMAN that he was running late because I-81 was backed up. I believe that BOWMAN asked MUNCY to turn around and meet JB BUCKNER at exit 94 to pick up illegal drugs and suspected methamphetamine.

**May 22, 2013**

(540) 320-1770 (new phone for James MUNCY) to BOWMAN, *"JB just clld 2c if I were lookn...that sorry fuck knew I bn lookn 4 ovr a week...Told him I'd go up the road n get*

7

*mine n 2 forget it...he just laughed n said that u were comin here 2moro 2 get yours...I hate shit like this...what a bad time this is 4 me...I hope his day comes soon, that sorry fuck..."*

**May 23, 2013**

(540) 320-1770 (James MUNCY) to BOWMAN, *"Did you evr get anything...I nvr heard bk frm u"*

**June 29, 2013**

BOWMAN to JB, *"Still no green?"*
JB to BOWMAN, *"I m going 2 go check after while"*

**July-1-2013**

BOWMAN to JB, *"Are you going to chevk on that?"*
JB to BOWMAN, *"Yea they agqeed on cost. But dont know wen"*

**July 2, 2013**

JB to BOWMAN, *"What is james last name"*
BOWMAN to JB, *"Muncie. Have you seen him"*

**July 13, 2013**

BOWMAN to JB, *"When you get things together I will meet you somewhere. James just left here I can't cover it right now but when your ready I will meey you."*
JB to BOWMAN, *"O K i appaciate it anyway"*
BOWMAN to JB, *"So you don't want to do anything"*
JB to BOWMAN, *"Wanted 2 get 1 or2, 2hold me until mine got here. James should have took care of that 4me gave him 100 last nite 2 get wife out jail"*

**July 16, 2013**

BOWMAN to JB, *"Still nothing on green paint?"*
JB to BOWMAN, *"Soon i hope ,you seen james?"*

**July 18, 2013**

JB to BOWMAN, *"U want 2 come me 2 nite or 2 moro ?"*
BOWMAN to JB, *"What's the deal?"*
JB to BOWMAN, *"Some of what u bn wantin"*
BOWMAN to JB, *"How much on your elbow?"*
JB to BOWMAN, *"Got 1 two split 4ways"*

8

BOWMAN to JB, *"How much"*
JB to BOWMAN, *"1200"*
BOWMAN to JB, *"No. Not me"*
JB to BOWMAN, *"Rodger That"*
BOWMAN to JB, *"I can't do nothing with . Make nothing. I will quit it all. You got to make a home run for yourself and no margin for anyone else*
JB to BOWMAN, *" Just trin 2 cover 4 peole so no 1 b mad*
BOWMAN to JB, *"You want to fuck me anytime we try to do anything anymore. Why? Most I ever maid off an elb ow was 100.00 Your wanting to make a homerun off of me. When and if you can ever treat me right give me a yell. I can't do shit like that. If I was still making 150000 a year I might for myself bu t since I'm on disability like you I wo nt be doing it. You think you should turn 1000- 1200 on every unit but your way off my ways. You don't want nobody to make anything but yourself do you. No reason to get mad little buddy you know its the truth. Clammed up and got mad at me. What ever jb. I know I have alwaus been honest and fair and always told you the truth. If you wsnt to get pissed off then fine. I know I have I did. Did it happen been good to you."*
JB to BOWMAN, *"I drove over 500 mi 2day not mad at all .no not the truth @ all u know that"*
BOWMAN to JB, *"Get the price down where I can get in then."*

**August 8, 2013**

BOWMAN to JB, *"Still no word on green paint?"*
JB to BOWMAN, *"Proabaly get some anyday now"*
BOWMAN to JB, *"Hsve you talked to them"*
JB to BOWMAN, *"Sure have"*
BOWMAN to JB, *"I'm struggling bad and need to do somethamphetamineing bad Let me know if I can get into the ball game"*
JB to BOWMAN, *"Well I always done u right wil help u if I can"*
BOWMAN to JB, *"Let me know when"*

**August 10, 2013**

BOWMAN to JB, *"I did. Did it happen"*
JB to BOWMAN, *"No , I called out there thou ,said not 2 worry they got track #"*
BOWMAN to JB, *"So when now.you sure you just didn't leave me out fucker."*
JB to BOWMAN, *"Mike i,m tryin 2 help iaint going pass u up"*

**August 11, 2013**

BOWMAN to JB, *"What's up jb. I thought you were goingcyo hell at me Are you not going to tell me anything buddy? You were r eady on friday and this is Sunday"*
JB to BOWMAN, *"Got c6pany. Will call u later If u make it down bring some tradeing goods if u can"*

BOWMAN to JB, *"I'm coming it will be around 4. I hope to leave here in 45 min. Is it raining there or suppose to rain? I'm wanting to come on a rocket ship but its tough landing in the rain. On my way just passed 45"*
JB to BOWMAN, *"Cool r u hungry"*
BOWMAN to JB, *"Always"*

**August 18, 2013**

BOWMAN to JB, *"Anything good happen on your trip?"*
JB to BOWMAN, *"Good trip"*
BOWMAN to JB, *"Did you get what I have been wanting?"*
JB to BOWMAN, *"Couldn,t tex while drivin. Just got the fast package"*
BOWMAN to JB, *"What's the scoore? "*
JB to BOWMAN, "*Score the same 4u"*
BOWMAN to JB, *"What's that?"*
JB to BOWMAN, *"Buckner – 2"*

**September 2, 2013**

BOWMAN to JB, *"Is there still nothing green up there shaking but the leaves on the trees?"*
JB to BOWMAN, *"No Maybe next mth."*

**September 7, 2013**

BOWMAN to JB, *"What's going on old man? Same thing and jonesing for green. Out. Jeff have any"*
JB to BOWMAN, *"Not that i know of"*
BOWMAN to JB, *"Nobody? Set us up and lets me and you take a trip out there and get s ome"*
JB to BOWMAN, *"That is a plan we need 2 b truck driver"*
BOWMAN to JB, *"Why? I would have no problem doing it. Have to do it right. Maybe Harley Davidson style."*
JB to BOWMAN, *"That would b good 2"*
BOWMAN to JB, *"Set it up and lets go"*
JB to BOWMAN, *"I wil c what i can do"*

30. Based on my training and experience, and my knowledge of this investigation, I believe that I believe that the above text from May through September 2013 show that James MUNCY, BOWMAN and JB BUCKNER are texting in furtherance of narcotics trafficking. I believe that these text discuss the distribution of Marijuana and Methamphetamine.

**September 11, 2013**

10

BOWMAN to Arama Wolfe at 540-632-8892: *"did you like it?" "beats bj's shit all to hell. This is good all the time."*
Wolfe to BOWMAN: *"whats not to like"*
BOWMAN to Wolfe: *"that's right sister. You work all night"*

31. Based on my training and experience, and my knowledge of this investigation, I believe that I believe that BOWMAN and Wolfe exchanged text referencing Wolfe purchasing meth from BOWMAN and BOWMAN telling Wolfe that the meth does not compare to that purchased from "JB" BUCKNER.

**September 23, 2013**

BOWMAN to JB, *"Still nothing"*
JB to BOWMAN, *"Oct"*
BOWMAN to JB, *"Oct is 31 days long"*
JB to BOWMAN, *"They let it go ALATC. Im just glad contact has ben made and stil like us"*

**October 18, 2013**

BOWMAN to JB, *"What's wrong that you won't respond to me jb. Very shitty if you ask me but if that's how you want things then have it your way."*
JB to BOWMAN, *"Im not going 2 talk on this phone . Thought we were going to meet last wk,never heard from u"*
BOWMAN to JB, *"Been busy and couldn't get there. Would it be worth the trip if I come now? If so I can be there by 12."*
JB to BOWMAN, *"No just wait .j was going 2 give a adress but got scared"*
BOWMAN to JB, *"U have mine don't you?"*
JB to BOWMAN, *"Yea i,ll run it by em let u know"*

**October 20, 2013**
JB to BOWMAN, *"Can i get your address"*
BOWMAN to JB, *"17453 moonstone rd. Abingdon Va. 24210"*
JB to BOWMAN, *"Couldn't work out anything on picking up?"*
BOWMAN to JB, *"We xan go all the way for the right price"*
JB to BOWMAN, *"I got Dr.app.tomor.they will make a move 2moro ,b here Sat."*

**October 25, 2013**

BOWMAN to JB, *"What's going on little buddy? Is the eagle still flying as planned"*
JB to BOWMAN, *"Yea , i hope they have a safe trip"*
BOWMAN to JB, *"Are you watching them any to see how they are coming along?"*
JB to BOWMAN, *"Afraid 2"*

11

BOWMAN to JB, *"Email me a # and I will check from a neutral location."*
JB to BOWMAN, *"I try 2 call Friday"*
BOWMAN to JB, *"What about you? Us ev erything still go for tomorrow?"*

**October 27, 2013**

JB to BOWMAN, *"I call u when the meat is on the table"*
BOWMAN to JB, *"Ok. I thought we were eating at my place yesterday but I suppose you lied to me."*
JB to BOWMAN, *"Got a no. For the path 2 go down"*

**November 1, 2013**

BOWMAN to JB, *"What time do they norm ally run at your delivery point? I will go check on it shortly"*
JB to BOWMAN, *"You will have 2 make up a user i d 2 log on 2 get a arriavil time Find out anything yet?"*
BOWMAN to JB, *"No I tried at home and couldn't get in"*

**November 2, 2013**

JB to BOWMAN, *"How r u today Just waitin on a bird 2 dump . Might have ride a manitory run ,u stil game ?"*
BOWMAN to JB, *"Call me"*

**November 5, 2013**

JB to BOWMAN, *"It,s here"*

32. Based on my training and experience, and my knowledge of this investigation, I believe that I believe that the above text from September through November 2013 show that James MUNCY, BOWMAN and JB BUCKNER are texting in furtherance of narcotics trafficking. I believe that these text discuss the distribution of Marijuana and Methamphetamine.

33. December 10, 2013, surveillance was conducted on the residence of J.B. BUCKNER in Pulaski, VA. Michael BOWMAN was observed arriving at BUCKNER's residence in a white GMC Yukon. After his departure, a traffic stop was conducted and BOWMAN was found to be in possession of a 9 mm handgun, a smoking device with what appeared to be methamphetamine residue, and $3,000.00 U.S. Currency.

34. April 1, 2014, CS-2 met with Nick BURKS and James MUNCY at their place of work located in Sullivan County, TN. BURKS told CS-2 that his methamphetamine source, referring to Michael BOWMAN, was "paying for it". BURKS told CS-2 that BOWMAN went to Texas on two (2) occasions where he obtained a couple of pounds of

12

methamphetamine. BURKS told CS-2 that BOWMAN's Texas deal fell through and he was currently being supplied methamphetamine from a local supplier. BURKS told CS-2 that one (1) ounce of the local methamphetamine was going to cost $2500.00. BURKS told CS-2 that BOWMAN was going to Texas in the next week or two and if successful, the price would change back to $1900.00 per ounce. CS-2 asked BURKS about purchasing marijuana. BURKS told CS-2 that he knew a guy in Dublin, VA who obtained marijuana and his name was "JB". BURKS agreed to introduce CS-2 for the purpose of purchasing marijuana from "JB". BURKS directed James MUNCY to introduce CS-2 to "JB", to which MUNCY agreed. BURKS told CS-2 that any "kickbacks" owed from the selling of marijuana obtained from "JB" should go to James MUNCY. MUNCY provided telephone number (540) 200-7567 as his current contact number.

35. April 24, 2014, CS-2 communicated with BURKS by phone at 276-608-9732 regarding purchasing an ounce of methamphetamine from BURKS. BURKS tells the CS that he is going to "Hillbilly Days" in Kentucky but he will hook the CS up with his guy "Mike". BURKS gave the CS a number for "Mike" of 423-956-7130. BURKS tells the CS to call later that day and he will set things up for an ounce for $1850. The CS makes the call and sets up a deal of an ounce of methamphetamine for $1850. CS-2 meets with BOWMAN In Bristol VA and gives him $1850. BOWMAN gives the CS a bag containing methamphetamine. BOWMAN talks about being paranoid of the police, that he has been selling methamphetamine for the past two years and that if the CS will purchase four ounces at a time he will sell for $1500-1600 per ounce. BOWMAN discusses selling the CS pounds of marijuana for $1600 and ounces for $150. The CS and BOWMAN depart company and the CS gets a call from BOWMAN moments later where BOWMAN states he gave the CS the wrong bag of methamphetamine that it is only the 1/2 ounce bag. The CS and BOWMAN meet the CS and BOWMAN exchange baggies with the CS getting an ounce baggie this time. BOWMAN talks about getting stopped by VSP with a methamphetamine pipe and gun leaving J.B. BUCKNER's place in Pulaski.

36. May 19, 2014 a search warrant was issued out of the Western District of Virginia for 423-956-7130 that is believed to be used by Mike BOWMAN. Pursuant to this search warrant, the electronic data was extracted from this phone and analyzed. As a result of this analysis, the following text were exchanged between BUCKNER at 540-230-4725 and BOWMAN at 423-956-7130:

**April 30, 2014**

BUCKNER to BOWMAN: *"you all right down there"*

**May 01, 2014**

BUCKNER to BOWMAN: *"if u want 2 do this i need to send him cabbage"*

BOWMAN to BUCKNER: *"get back with you in a little while"*

13

BUCKNER to BOWMAN: *"cool georage droped off 4 hundred"*

BOWMAN to BUCKNER: *"call me when u can" "yes"*

37. Based on my training and experience, and my knowledge of this investigation, I believe that that the above text between BOWMAN and JB BUCKNER are communication in furtherance of narcotics trafficking. The text on April 30 from BUCKNER to BOWMAN asking if he is OK down there is referencing BOWMAN who at the time was on his way back from a trip to Texas on which I believe that he purchased methamphetamine.

38. May 01, 2014, CS-3 was interviewed in Abingdon, VA. CS-3 stated he and Tim FIELDS would meet J.B. BUCKNER in Glade Spring, VA on a weekly basis. During the meetings FIELDS purchased ½ pound of marijuana from BUCKNER and BUCKNER purchased 6 to 7 grams of methamphetamine from CS-3. CS-3 stated BUCKNER lived in a mobile home with two dogs, one of which was a larger dog, and drove a pick-up truck that had a secret box underneath his truck to conceal drugs. CS-3 stated he had seen an AK style rifle by the front door of BUCKNER's residence in the past. BUCKNER kept his drugs in a back bedroom of the home. CS-3 stated between 2010 and 2012 BUCKNER obtained marijuana from Portland, Oregon via Fed Ex. CS-3 advised to his knowledge BUCKNER received the packages once a week and they were delivered to someone's residence near BUCKNER's home in Pulaski, VA. CS-3 stated BUCKNER purchased a total of 1-2 ounces of methamphetamine from him.

39. June 17, 2014 a search warrant was issued out of the Western District of Virginia for 276-608-6978 that is believed to be used by Mike BOWMAN. Pursuant to this search warrant, the electronic data was extracted from this phone and analyzed. As a result of this analysis, the following conversations were noted:

    June 11, 2014 the following text were exchanged between 276-608-6798 (BOWMAN) and 540-230-4725 (BUCKNER):

    BOWMAN to BUCKNER: *"Have you ever got ur head out of ur ass an want to do whats right? Or do you want to pay me the 1000 dollars you owe me and be done"*

    BUKNER to BOWMAN: *"How in the hell do you come up with that#?"*

    BOWMAN to BUKNER: *"650 my money was short and what the shit was short"*

    BOWMAN to BUCKNER: *"I give you 4250 and got back 3600 do the math"*

    BUCKNER to BOWMAN: *"200 that went to shipin & handlin 60 for 2 phones, 40 for phone cards, and gas, and I got 2 things of that shit u wrapped up"*

14

BOWMAN to BUCKNER: *"Your stupid as hell you always change the price to benefit JB. Fuck you. I will see you ion hell you dirty bastard before I let you fuck me."*

BUCKNER to BOWMAN: *"Mike I will pay you. Let me make somethamphetamineing very fucking clear. Do not B cussing me or bad mouthin me, I can break you in half & U cant do a thing about it."*

40. Based on my training and experience, and my knowledge of this investigation, I believe that I believe that the above text show that BOWMAN and JB BUCKNER are texting in furtherance of narcotics trafficking. I believe that these text discuss the distribution of Methamphetamine. Just days before these text BOWMAN returned from a trip to Texas where I believe he purchased methamphetamine.

41. June 26, 2014 VSP was informed by a source who observed blue ford P/U 8650 T/K at BUCKNER's residence. Comes back to Arama Wolfe (ARAMA REPO WOMAN in text) and James Jachimski. These are persons who are believed to make purchases from BUCKNER and BOWMAN.

42. March 15, 2015 surveillance observes BOWMAN's VW Jetta at BUCKNER's residence. Surveillance observes three males one of whom is believed to be BUCKENR, one of whom is believed to be BOWMAN and the third is unidentified.

43. June 10, 2015 law enforcement working on this investigation conducted a check of discarded household waste at the residence of JB BUCKNER. In the discarded bags of trash were documents in the name of JB BUCKNER with the address of 3720 Lone Oak Rd, Radford, VA and a baggie with a white residue that was suspected methamphetamine. The baggie was field tested and tested positive for methamphetamine.

44. On July 14, 2015 a search warrant was obtained on the residence of JB BUCKNER Located at 3720 Lone Oak Rd, Radford VA.

45. On July 16, 2015 a search warrant was executed on BUCKNER's residence. During the course of the search ammunition, documents that appear to be owe sheets and a small quantity of suspected methamphetamine were located.

46. BUCKNER was read his rights and waived them and then admitted to the agents that he distributed several pounds of crystal methamphetamine over the past several years to numerous individuals.

47. JB BUCKNER was convicted of a felony for distribution of methamphetamine on July 13, 2006 in Pulaski County VA.

## COOPERATING SOURCES

15

Throughout this affidavit your affiant will identify several individuals by name and several as Cooperating Sources (CS) which were interviewed during this investigation. Your affiant believes the information provided by them, and included in this affidavit, to be credible and reliable for the following reasons: the debriefings included statements against their own penal interest, the information provided by them matched information received from other sources, and much of this information was confirmed by other investigative methods. Some of these methods included surveillances and records acquired during the investigation, including records of phone calls and text messages between the co-conspirators.

CS' are utilized for several reasons: a CS might be a member of the target organization and therefore have easy access to information needed by law enforcement; a CS might have a relationship with members of the target organization, making it easy to purchase and/or locate illegal substances, profits, etc.; and in many situations a CS provides to law enforcement the opportunity to infiltrate an organization when all other means are exhausted.

## CONCLUSION

Based on the aforementioned factual information and your affiant's training and experience in criminal investigations, your affiant believes that probable cause exists to conclude that, in or about March 2010 until present, within the Western District of Virginia, the Eastern District of Kentucky and the Southern District of Texas the aforementioned persons committed one or more violations of title 21 United States Code Sections 846 Conspiracy to distribute methamphetamine.

## REQUEST FOR SEALING

It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on July 16th, 2015, at Abingdon, Virginia.

_____
William C. Duke Special Agent

16

SWORN AND SUBSCRIBED TO BEFORE ME
THIS __16th__ DAY OF JULY, 2015

_Pamela Meade Sargent_
HONORABLE JUDGE PAMELA MEADE SARGENT
UNITED STATES DISTRICT COURT IN THE
WESTERN DISTRICT OF VIRGINIA